```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   INLAND DIAMOND PRODUCTS      )(

 5   CO.                          )(    CIVIL DOCKET NO.

 6                                )(    2:17-CV-416-JRG

 7   VS.                          )(    MARSHALL, TEXAS

 8                                )(

 9   HOYA OPTICAL LABS OF         )(    MARCH 26, 2018

10   AMERICA, INC.                )(    1:35 P.M.

11                    CLAIM CONSTRUCTION HEARING

12          BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                    UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
17

18   FOR THE DEFENDANT: (See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
19

20   COURT REPORTER:    Shelly Holmes, CSR, TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1                         I N D E X

2

3    March 26, 2018

4                                                    Page

5         Appearances                                 1

6         Hearing                                     3

7         Court Reporter's Certificate               64

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated, please.

3          All right.  This is the time set for claim

4    construction in the Inland Diamond Products versus Hoya

5    Optical Labs case.  This is Civil Action 2:17-CV-416.

6          Let me call for announcements at this time.

7          What says the Plaintiff, Inland Diamond Products?

8          MS. HENRY:  Good afternoon, Your Honor.  Claire

9    Henry on behalf of Plaintiff.  Along with me today is my

10   co-counsel, John Halan and Mark Jotanovic.  We're ready to

11   proceed.

12         THE COURT:  All right.  Thank you.

13         What's the announcement for Defendant?

14         MR. SMITH:  For Defendant, Hoya Optical Products,

15   Your Honor, Michael Smith, and with me today is Mr. James

16   Isbester, Mr. James Sze, and Mr. Kerry Hartman.  And we're

17   ready to proceed.

18         THE COURT:  All right.  Thank you.

19         Counsel, before we get to the disputed terms, my

20   notes indicate that the parties, at least from their

21   submissions as I read them, have agreed for the Court to

22   provide the plain and ordinary meaning with no affirmative

23   need to specifically construe the follow three terms:

24   "ranges from," stemming from Claims 2 and 6 in the '360

25   patent; the term "apex" from Claims 2 and 11 in the '130

1   patent; and "secured to" from Claims 7 and 11 in the '130

2   patent.

3        Is the Court correct in this regard, or is there

4   still some disagreement among the parties?

5        What says the Plaintiff?

6        MS. HENRY:  Correct, Your Honor.

7        MR. SMITH:  That's correct, Your Honor.

8        THE COURT:  Okay.  Then the Court will not construe

9   those terms specifically, and we'll move on to the ones that

10  are in actual dispute.

11       We'll start with "interference fit," and let me

12  hear Plaintiff's argument from the podium, please.

13       MR. HALAN:  Hello, Your Honor, John Halan, again.

14       THE COURT:  Good afternoon.

15       MR. HALAN:  Good afternoon to you, too.

16       THE COURT:  Please proceed.

17       MR. HALAN:  Okay.  So this first slide we have

18  here, just as a short brief on the technology at issue,

19  which I'm sure Your Honor already understands, but I wanted

20  to -- and, obviously, it involves an eyeglass frame that

21  encircles a lens, and the lens has a bevel on it.

22       And the main two parts at issue today are that the

23  lens have an interference fit within the frame, which means

24  that at least one dimension of the lens exceed one interior

25  dimension of the frame and that the lens bevel have an angle

1   that is less than the frame grove angle.

2        And I just want to point out one thing with regard

3   to Figure 2 that's off to the right, because I notice from

4   opposing counsel's slide show, that one of their arguments

5   they're going to make is that this doesn't show the frame

6   completely encircling the lens.  So that will lead one way

7   from interference fit as we're -- we're presenting it.

8        But Figure 2 is obviously just a -- a cutaway.  You

9   can see that the frame has been cut away at the -- not only

10  at the top but also up inside the right side.

11       The patent talks about maintaining lens securely

12  from the frame so it doesn't fall out.  That would only

13  happen if the frame encircles the lens.

14       THE COURT:  Now, your -- your representation is how

15  I view Figure 2, as well.

16       MR. HALAN:  All right.  Thank you, Your Honor.

17       THE COURT:  It's a cutaway.

18       MR. HALAN:  Thank you.

19       Next slide.

20       So this shows -- this is an example claim, but we

21  have our construction, and our construction -- it's really

22  only the green part that we're requesting the Court to use.

23  I mean, the last part of it, opposing counsel point out in

24  their briefing that's -- and the claims are within the

25  specification.

1          But our main definition we're asserting is that

2     an -- interference fit means that the external dimension of

3     the lens exceeds a corresponding internal dimension between

4     the frame channel bottoms.

5          Now, Hoya's asserted construction has changed.

6     Initially it was the top one there, a point of contact at

7     which frictional forces interfere with the motion of the

8     lens.  And then after reading our brief and realizing the

9     error of their ways, they -- they changed it, and they went

10    to a different definition.

11         I just want to point out that the language we have

12    highlighted in blue there is basically the same language in

13    both definitions.  So they have moved -- they've moved from

14    a point of contact at which into a different contact

15    argument, a bevel fitting into a triangular channel in such

16    a manner that it, again, interferes with motion by

17    frictional forces.

18         The -- the problem with this, again, is it's

19    just -- it's just contact alone.  I'm going to get to that

20    in more detail.  But, also, Your Honor, they're trying to

21    add limitations contrary to the patent.

22         And if you can go to the next slide.

23         So, for example, they're trying to add a limitation

24    that the channel be triangular.  And by the way, Your Honor,

25    this slide and the next slide are not in the printed pub --

1  printouts I gave.  I just thought of these this morning, so

2  I apologize, and I can provide printouts to the Court

3  afterwards if you'd like.

4          But -- so they -- they want to assert that

5  interference fit require a triangular channel, when I show

6  on the right-hand side, our patent clearly shows there

7  doesn't have to be a triangular channel.  In fact,

8  triangular channel -- the word "triangular" doesn't occur

9  anywhere in -- in the patent.

10         The only thing that can possibly be construed that

11  maybe mean a triangular channel is Dependent Claim 12 of the

12  '360 patent, which is shown here that describes the

13  receiving channel bottom comprising the intersection of the

14  opposed interior wall surfaces which appears to be what

15  would be shown on Figure 3B on the right which would be --

16  would follow through triangular, but it's not a requirement

17  of the claims.

18         And so we have some log on here -- not only do they

19  try to improperly import a limitation from a dependent

20  claim, but as we pointed out in the log on here, this -- the

21  claim construction they're asserting does not encompass a

22  disclosed embodiment, that being the Figure 6 embodiment,

23  and -- and there's warnings that, of course -- of course,

24  you're not going to construe the claims to be limited to one

25  embodiment such as what's shown in Figure 3B.

1        Now, their problem with their construction -- go to

2  the next slide -- is, again, it's just -- all that's

3  occurring, again, is mere contact.  This is their

4  construction, and this is a pretty poor drawing.  I did it

5  hastily this morning, Your Honor.  I'm sorry, I'm not an

6  art -- artist.  But if you assume that the yellow is the

7  lens, and, obviously, we have a curvature to it.  It

8  wouldn't be two triangulars.

9        THE COURT:  I got no problem with your drawing.  I

10  wish you had used a larger font, but nonetheless...

11        MR. HALAN:  Okay.  I'm sorry, Your Honor.

12        THE COURT:  I think I can read what you've got

13  here.

14        MR. HALAN:  But assuming this is a -- the blue --

15  the blue part is a cross-section of a frame, their

16  construction would cover mere contact.  So as long as the

17  bevel fits into a triangular channel in such a manner that

18  the channel interferes with the motion of a lens by

19  frictional force, according to them, that would meet the

20  claim limitation.

21        But if it's only contact -- let's say the example

22  here shown at the bottom of the frame and the top is loose,

23  it wouldn't be secured as required by the patent.  And the

24  patent stresses that the interference fit secures a lens

25  within the frame.

```
1              THE COURT:  Let me ask you this, counsel.

2              MR. HALAN:  Yes.

3              THE COURT:  What's your position on compression?

4    Is it your view that compression is inherent in achieving an

5    interference fit within the scope of the terms -- claims,

6    rather?

7              MR. HALAN:  It is our position that an interference

8    fit would result in compression.  There are two different

9    terms -- interference fit is the -- is describing the

10   dimensional relationships between the various pieces, while

11   compression is -- is giving the result.

12             And that was actually added during prosecution,

13   Your Honor.  One reason it was added during prosecution was

14   to -- to avoid the way the examiner -- the things that the

15   examiner was saying, to make sure it was clear that

16   interference fit, it does result in compression, which is --

17   our -- our view of the point is that compression confirms

18   that interference fit is what we're arguing it does mean.

19             THE COURT:  Well, if you take your proposed

20   construction and you drop out the resulting contact and

21   secures the lens and you've told me just to focus on the

22   blue, which is the prior part of the proposed construction,

23   it seems what you're basically saying in layman's terms is

24   the lens is bigger than the frame when they fit together.

25   And so either the frame has got to give, the lens has got to
```

1   give, or they've both got to deform in some way once they

2   get in a position to achieve this interference fit.

3          MR. HALAN:  Well, given the -- to form, the form

4   can -- as we pointed out in our brief, you're -- you're

5   right, Your Honor.  We're saying at least one dimension --

6   only one dimension has to be greater than the frame.

7          So, for example, if -- if the vertical dimension of

8   the lens were greater than the frame dimension, but the

9   horizontal dimension was a little bit smaller than the frame

10  dimension, there would be an interference fit, but the frame

11  actually just bends to allow the lens to fit into the frame,

12  but there would be an interference fit.  And -- and

13  depend -- and -- and whether it deforms or not, it all

14  depends on, first of all, the extent of the difference in

15  size.

16         THE COURT:  So de -- deformation is not a given?

17         MR. HALAN:  No, it's not a given, Your Honor.

18         THE COURT:  And is compression a given, in your

19  view?

20         MR. HALAN:  If there's interference fit, there will

21  be compression --

22         THE COURT:  Okay.

23         MR. HALAN:  -- yes, Your Honor.

24         THE COURT:  Go ahead.

25         MR. HALAN:  Okay.  And, again, Your Honor, in our

1   original -- with regard to the original construction, one

2   of -- you know, we -- one of our positions we pointed out is

3   that mere contact -- the resistance by frictional forces

4   isn't sufficient because a lens laying on a table, you can

5   push it, and there's -- frictional force is resistant to

6   pushing, that's not a fit -- that doesn't -- that doesn't

7   meet the fit requirement, and it surely does not meet the

8   interference fit -- the interference fit requirement.

9         The same thing, again, which is shown on this

10   drawing, you can -- example, you take the lens out, and if

11   there's a groove on a table, a triangular groove, you can

12   put the lens in that groove, and you can push it, and

13   there'd be frictional forces resisting it, but that would

14   not be a fit and sure wouldn't be an interference fit.

15   There would be nothing -- this doesn't -- but their

16   definition by itself does not secure the lens within the

17   frame.

18         Next slide.

19         So this is some things that were discussed in our

20   brief.  Obviously, there's a heavy presumption that a claim

21   terms carries its ordinary and customary meaning.

22         Hoya out -- has out -- out -- outright rejected the

23   ordinary meaning of interference fit as it's understood in

24   the art of eyeglass technology.  And, actually, it's a --

25   it's a well understood term in engineering -- all kinds of

1    engineering disciplines, but it's not the kind of term

2    that's understood by a layperson.

3           And the quote there at the bottom is the ordinary

4    meaning of interference fit taken from a dictionary.  And,

5    again, the def -- the ordinary meaning of interference fit

6    is that a dimension of one part be larger than the part to

7    which it's being inserted or fitting.

8           So if you go to the next slide.

9           And, again, this is just pointing out that if it is

10   a term that's not understood right -- understood by a

11   layperson, you're allowed to use extrinsic evidence.  And in

12   this case -- and it hasn't been disputed at all in this

13   case, all -- all extrinsic evidence points to the same

14   ordinary meaning.  And I'm not going to bore Your Honor with

15   the -- all the extrinsic evidence we have in our brief,

16   but -- go to the next slide.

17          We have a number of inter -- industry treatises

18   that we've cited.  This is one of them where it talks about

19   the outer -- outer diameter of a ring being oversized -- and

20   figure out the inner dimension of a cell into which it's

21   being asserted -- inserted.  That's interference fit.  And

22   if you need further explanation of any of these, just let me

23   know, Your Honor.

24          Next slide.

25          This is -- was Hoya's own evidence that they've

1   relied upon.  The left side is showing what's called the

2   clearance fit where the dimension of the piece on the right

3   is smaller than the bore or opening into which it's being

4   inserted, while in interference fit, and it's an

5   exaggeration, obviously, but the interference fit on the

6   right side is showing that there has to be a dimension

7   bigger on the shaft -- bigger than the hole into which it's

8   being inserted, again, confirming our definition.

9           Next slide.

10          We cited a number of prior art patents in the

11  optical industry, Your Honor, and they all confirm exactly

12  our definition.  And, again, this is evidence of -- of how

13  this term is understood in the -- in the art.

14          THE COURT:  I'm not -- I'm not hearing anything

15  about the necessity of a point of connection between the

16  vertex of the bevel and the vertex of the channel or

17  retention structure.  What's your view on that?

18          MR. HALAN:  Well, the claim -- the claim requires

19  that.  The claim requires that between the vertex of the

20  bevel angle and the groove of the channel.  I'm not sure --

21  but it also requires in addition to that that there be an

22  interference fit, which requires, again, that one size be

23  bigger than the other size.

24          And the only way that can be achieved is that one

25  dimension -- overall dimension of the lens is larger than

1   one internal dimension of the frame.

2           THE COURT:  I'm just trying to get the broader

3   context here.

4           MR. HALAN:  Okay.  Did I answer your question?

5           THE COURT:  I think so.

6           MR. HALAN:  Okay.  So, again, there are a number of

7   prior art patents.  They all confirm our meaning again.

8   Hoya is not pointing to anything to the contrary.

9           And next slide.

10          We had our own expert inventor testimony.  He's had

11  more than 47 years of experience in this industry.  It's set

12  forth in his declaration.  And as he testified, it's clear

13  be -- at the time, before and after that, the term

14  "interference fit" has always had just one meaning in the

15  industry, and that -- that is that one dimension exceed the

16  dimension of the piece into which it's being inserted or

17  assembled.

18          Next slide.

19          There's only two exceptions to ordinary meaning,

20  Your Honor.  Both of them require that the patentee take an

21  action.  So the first is the patentee sets out a definition

22  of his own, contrary to ordinary meaning.

23          The second is if the patentee disavows the scope of

24  the claim, either in the specification or during

25  prosecution.  It not only must be done by the patentee, it

1  must be clear -- must -- the clear -- the alternative

2  definition must be clearly set forth.  And not only that,

3  but the intent to change the definition must be clearly

4  expressed.

5       And, again, for disavow the same thing.  It

6  requires a clear disavowal.  And in the final case we have

7  cited there, absent a clear disavowal or contrary

8  definition, the patentee is entitled to the full scope of

9  his claim language, that being ordinary meaning.

10      Next slide.

11      So Hoya's main argument is they relied on the

12  examiner's statement that was made during prosecution.  So

13  in the top there, there's the examiner's statement.  And

14  this is taken from Hoya's brief.  In the Office Action, the

15  examiner defined the claim language.

16      So it was something the examiner said.  It was

17  never adopted by the patentee.  It's first our position --

18  in these bullet points down here are our various positions

19  in response to their positions.

20      The first one is our position is the examiner is

21  merely stating his own view of how the Chappell prior art

22  patent bevel interacted with the frame channel.  And, by the

23  way, the drawing done on the right side, that's taken from

24  the Chappell patent.

25      And, again, the prosecution history -- as set forth

1  in our second bullet point, the prosecution history cannot

2  be relied upon for disavowal or an alternative definition

3  unless the applicant took the position before the PTO.  The

4  applicant never took this position.  That was something that

5  the examiner said.

6         And, in fact, as set forth in the next bullet

7  point, Inland specifically rejected that examiner's

8  statement.  We said -- it was pointed out the frame groove

9  of Chappell is actually not securing the lens to the frame.

10  As shown on the right-hand side in the Chappell patent, the

11  frame is only a half piece on the top, and there's a wire

12  piece that goes around the -- the perimeter of that and

13  holds the lens in place.

14         So the frame there was not going to hold it in

15  place.  There's no interference fit or any kind of fit by

16  the frame itself holding the lens in place.  It requires an

17  extra piece, a metal -- yes, Your Honor.  It looks like you

18  have a question.

19         THE COURT:  Well, I was going to ask you to slow

20  down a little bit.  I'm trying to make sure I follow you,

21  and some of what's coming out is rattling out pretty

22  quickly.

23         MR. HALAN:  Okay.  Okay.  Should I back up a little

24  bit?

25         THE COURT:  No.  I think I'm with you, just if

1    you'll slow down going forward.

2         MR. HALAN:  Okay.  Well, again, so Inland rejected

3    the examiner's statement.  Inland described what's actually

4    being shown by Chappell, and they -- and by saying Chappell

5    does not teach an interference fit.

6         And then the last bullet point, to make it even

7    more clear, in a later Interview Agenda, Inland stated this,

8    quote, one potential amendment could be to add that the

9    vertex is compressed or that it deforms as a result of the

10   interference fit, period, close quote.  And that amendment

11   was later made, as pointed out in the briefs.

12        So, again, the compression was an element that was

13   added to -- to further distinguish interference fit from any

14   other kind of fit that the examiner was saying it was.

15        THE COURT:  All right.

16        MR. HALAN:  And, again, the main thing -- one of

17   the main things here, again, is that the applicant never

18   took that position.  It never disavowed.  It never

19   redefined.

20        Next slide.

21        And that's all I have on interference fit, Your

22   Honor.

23        THE COURT:  All right.  Let me hear a response from

24   the Defendant.

25        MR. ISBESTER:  Good afternoon, Your Honor.  James

1    Isbester on behalf of Hoya.

2            THE COURT:  Good afternoon.  Go ahead.

3            MR. ISBESTER:  I'd like to begin, if I may, with a

4    brief description of -- of Hoya and its business because I

5    think it -- it may be informative to understanding the

6    background of this case.

7            Hoya makes prescription lenses.  It starts with

8    blank lenses.  And then, for example, if you require a new

9    pair of eyeglasses, Your Honor, you go to your optician.

10   The optician would determine the prescription, confer with

11   you about a frame, select a frame.  The optician would

12   acquire the frame, and then send the frame, with the

13   prescription information, to Hoya who would take one of its

14   blank lenses, surface the lens to the prescription

15   appropriate to the patient, edge the lens to fit within the

16   eye frame, mount the lens in the frame, and send it back to

17   the optician.

18           The point of this is that in its first slide,

19   Inland describes to you the various components of the

20   technology here.  The frame part of that equation is

21   something that Hoya does not do, and we're not privy to the

22   design of frame information other than what the optician

23   tells us and the mounting procedure that we do.

24           THE COURT:  But it's the frame that informs you as

25   to how to prepare the lens so that it fits together as a

1   complete product?

2          MR. ISBESTER:  In some -- in some respects, but in

3   others not.

4          THE COURT:  All right.

5          MR. ISBESTER:  We've got a certain amount of

6   limited data either from the frame or from the optician, and

7   cut the lens to that limited data.

8          It may come up down the road, so I'll simply point

9   out now that among the pieces of information that are not

10  provided and not acquired by Hoya is the shape of the

11  channel into which the lens is placed.  All Hoya does is

12  measure the -- the circumference of that channel, and then

13  it cuts a lens to fit into that circumference.

14         THE COURT:  You don't actually measure the angle of

15  the channel itself, just the circumference?

16         MR. ISBESTER:  Exactly.

17         THE COURT:  If you wanted to measure the angle of

18  the channel, I assume you could do that?

19         MR. ISBESTER:  Your Honor, this is not on the

20  record anywhere, but we have inquired.  There was a machine

21  that was developed in Japan and sold in the United States

22  that would do that.  Hoya was never able to get that machine

23  to provide accurate readings and so has never used it

24  commercially.  That was several years ago -- I think about

25  five years ago.  At the moment, we don't have any way of

1    measuring that angle.

2         THE COURT:  Well, and I understand the dictates of

3    commerce might require that you not do certain steps or

4    functions that in a vacuum you might be able to do, but

5    having possession of the frame, I guess you could measure

6    any way you wanted to measure it, even though you might not

7    do that in your practice or it might not be commercially

8    feasible to take intricate measurements in -- internal to

9    the retention channel or -- or the frame.

10        MR. ISBESTER:  Presumably, there are people with

11   the right measurement equipment somewhere who -- who could

12   do that.

13        THE COURT:  But that's not your client?

14        MR. ISBESTER:  But that's not my client's?

15        THE COURT:  Okay.

16        MR. ISBESTER:  And -- and I agree, Your Honor, that

17   my client could go out and obtain the equipment necessary to

18   do that, but it hasn't done that.

19        THE COURT:  All right.

20        MR. ISBESTER:  Now, counsel wanted to bring to your

21   attention at the outset of the comments Mr. Halan offered,

22   Figure 2 of the patent.

23        And if I could ask Mr. Hartman to flip to Slide 23.

24        We've colorized Figure 2, the gray for the frame

25   because these frames are described in the patents as -- as

```
 1   metal frames, and the blue for the lens.  And --
 2           THE COURT:  So those are sunglasses?
 3           MR. ISBESTER:  Yeah.  Exactly, Your Honor.
 4           And -- and Mr. Halan commented that this is a
 5   cutaway, and the other half of the lens is intended to be --
 6   is implicit in this drawing.
 7           And the implication -- or at least the inference I
 8   drew is that this is a case about eye frames in which the
 9   frame entirely encircles the lens.
10           And I just wanted to direct the Court's attention
11   to the patent -- Mr. Hartman, if you can bring that up.
12           Top of Column 5 of the patent, for -- further, it
13   should be understood that the bevel may be connected to the
14   vertex and so forth.  In addition, it should be
15   understood -- and it goes through a number of different
16   iterations of what this invention can cover.
17           And then finally, it says:  For example, the bevel
18   may be present on a portion of the lens body periphery when
19   the lens body is used with eyeglass frames having only
20   framed portions corresponding to the upper half of the lens
21   body.  In other words, Your Honor, Figure 2 is the generic
22   instance of the invention of this patent.
23           There is no doubt -- excuse me -- also a specific
24   instance in which the frame entirely encompasses the lens,
25   but that's nowhere shown in the patent.
```

1          THE COURT:  I understand.

2          MR. ISBESTER:  One last detail about -- about my

3    client.

4          Hoya is located in Lewisville here in -- in the

5    Eastern District of Texas where it has its head office,

6    450 employees there, and approximately a thousand employees

7    around the country, all of whom are engaged in the same

8    business of surfacing lenses to a prescription and mounting

9    them in the frames.

10          Now, if I can ask Mr. Hartman to flip to Slide 9.

11          Mr. Halan made a comment about the frame

12    triangular.  And before we get into the discussion of -- of

13    our reasons why we believe our definition of interference

14    fit is correct, let me just point out one concern I have

15    about Mr. Halan's comments.  And, that is, if you look at

16    the definition of the channel, it's defined by -- and after

17    the highlighted terms, which we may not need to address

18    today, the highlighted term "defined by," you see:  Opposed

19    interior wall surfaces having a first angle therebetween.

20          So the point, Your Honor, is that when you have

21    opposed interior wall surfaces and they define an angle,

22    that's a triangle.  So Mr. Halan's objection to the word

23    "triangle," I don't think, is consistent with the claim

24    as -- as written.

25          Okay.  Mr. Hartman, can we go to Slide 14?

1          Now, here you see, Your Honor, the -- the claim

2    language that is in dispute.  This is an excerpt from the

3    '360 patent, Claim 1, and the two parties' competing

4    definitions.

5          And the first thing that struck me when I saw this

6    put together was how much longer the Plaintiff's definition

7    is than the Defendant's.

8          This turns patent litigation -- or at least claim

9    construction -- excuse me, Your Honor -- on its head.

10   Ordinarily, the Plaintiff is seeking a broad construction

11   that will apply to lots of different accused products, and

12   the Defendant is trying to avoid infringement by seeking a

13   narrow construction.

14         That's not what's happening in this case, Your

15   Honor.  With respect to both "interference fit" and "in

16   compression," the Plaintiff has realized the -- thank you --

17   the effectiveness of their representation at the PTO may

18   have been a little bit too good, and they have obtained

19   claims that are too broad.

20         And now, before you, the Plaintiff is seeking to

21   disavow claim structure by adding claim scope -- excuse me,

22   by adding new structures to the claim.  And we will see this

23   repeat both, as I said, in "interference fit" and "in

24   compression."

25         Next slide.

1          THE COURT:  Let me ask you this, counsel.  In your

2     briefing, you argue that the ordinary and customary meaning

3     of interference fit requires the interference, I think you

4     said, under all tolerance conditions.  Can you tell me what

5     you mean by "under all tolerance conditions"?

6          MR. ISBESTER:  Yes, Your Honor.

7          Now, perhaps this would have been more appropriate

8     for a jury presentation, but --

9          THE COURT:  We may get there.

10         MR. ISBESTER:  -- I find it easier to work with

11    something physical.

12         In -- in this instance, this is the prior art.  So

13    you have a -- a big wide bevel that's fitting into a

14    triangle -- in a triangular channel.  And there are

15    certain -- there's a space at the bottom here.  And during

16    prosecution, the Plaintiff -- well, Mr. Wiand, argued that

17    that space was a disadvantage.  It meant that the bevel

18    didn't fit as far into the channel as it would have

19    otherwise.

20         The invention was to narrow the bevel.  Same

21    channel.  Now the bevel fits further down.  And you've got a

22    tolerance from the top of the -- of the channel to its

23    bottom that's sufficient to keep the lens from popping out

24    of the frame.

25         So here is, obviously, the optimum situation, but

1  if it's not quite optimum up to the full height of the

2  channel, it's still sufficient to keep the bevel in the

3  channel.

4         And we believe that that's -- indeed, to the extent

5  there is an advantage to this design, that's -- that's

6  probably the primary advantage, not that the bevel is

7  contacting the bottom of the channel but rather that the

8  narrower shape of the bevel ensures a greater range of

9  tolerance -- a greater tolerance and still operate properly.

10         THE COURT:  So what you're telling me is that your

11  meaning of "under all tolerance conditions" is as long as

12  the bevel is somewhere inside the channel?  Is that what

13  you're saying?  I'm not sure I'm following you.

14         MR. ISBESTER:  Well, our -- our construction

15  doesn't specifically require under all tolerance conditions.

16         THE COURT:  But I thought you argued for that in

17  your briefing.  It didn't make it to your construction,

18  but it -- but --

19         MR. ISBESTER:  I apologize, Your Honor, if that

20  appeared to be what we were requesting in our --

21         THE COURT:  Okay.

22         MR. ISBESTER:  -- in our briefing.  It was not our

23  intent.

24         THE COURT:  Then we'll move on.

25         Are you telling me that unlike many typical

1   situations where the Plaintiff wants a broad construction

2   and the Defendant wants a narrow one to avoid infringement,

3   that the Plaintiff wants a narrow one here to avoid

4   invalidating prior art, or what's your rationale as to why

5   this is not the typical situation?

6          MR. ISBESTER:  We believe that's what -- exactly

7   what's going on, Your Honor.

8          THE COURT:  Okay.

9          MR. ISBESTER:  I -- I realize that's putting the

10  cart before the horse, but I think that's where we end up.

11         THE COURT:  All right.  Continue with your

12  argument, please.

13         MR. ISBESTER:  Mr. Halan addressed at some length

14  the extrinsic evidence of the plain and ordinary meaning of

15  interference fit.  And that extrinsic evidence is what

16  informs in what I would respectfully suggest is a

17  cherry-picking fashion, the definition that the Plaintiff

18  has provided.

19         I'm sorry, where -- can we go to Slide 15?  Yeah,

20  okay.

21         And that definition is incorrect, we believe, for

22  four separate reasons.

23         The first is that it incorporates into the claim

24  limitations that are found not in the specification even but

25  in the extrinsic evidence.

1          And as Your Honor knows, extrinsic evidence is

2    disfavored.  As the Court in Phillips pointed out, there's

3    often so much extrinsic evidence, often contradictory, that

4    one can form just about any definition one wants if one is

5    permitted to use the extrinsic evidence.

6          But what we would like to do here is show you why

7    it doesn't work for perhaps the clearest legal reason, that

8    it conflicts with what's taught by the specification.

9          Next slide.

10          The Plaintiff went through a variety of sources,

11    treatises, dict -- dictionaries, and so forth from which

12    they selected discrete components of a -- of a definition.

13    And so you see a fit in which one part is -- slightly

14    exceeds the internal dimension of the part into which it has

15    to fit or one is larger than the other.  That's the -- the

16    theme throughout.  Every time their definition of

17    interference fit requires that a bigger thing be squeezed

18    into a smaller thing, into a smaller space.

19          And in case one missed the point, at Page 14 of the

20    brief, Plaintiff demonstrates the difference between or

21    illustrates the difference between a clearance fit and an

22    interference fit.  And here you have a shaft of a particular

23    diameter fitting into a hole of a particular diameter.  And

24    the shaft, although not terribly illegible in this drawing,

25    is a little bit smaller than the hole into which it is

1   supposed to fit.  That's a clearance fit.  Seems pretty

2   straightforward.

3         And then you have the opposite, an interference

4   fit.  And here you have a hole and a shaft that is much

5   bigger than the diameter of the hole, and the shaft has to

6   be forced into that hole.

7         So is that what the patent describes?  Absolutely

8   not.  Remember, this is the prior art.

9         If we can go to the next slide.

10        Figure 3 -- 3A is the prior art where you have a

11  wider bevel being forced into a narrower channel.

12        Figure 3B, where you have a narrow bevel and a

13  wider channel, is the invention.

14        So the definition that Plaintiff now offers turns

15  what's taught by the patent on its head.

16        THE COURT:  Well, I understand the Plaintiff to be

17  arguing that the larger component to fit in the smaller

18  component is the lens to fit in the frame.  It seems like

19  what you're telling me is this relates to the -- the bevel

20  and the retention channel as -- as opposed to

21  larger/smaller.

22        MR. ISBESTER:  Exactly.  And --

23        THE COURT:  So is it -- is it the bevel and the

24  channel, or is it the lens and the frame?  What are we

25  comparing to determine if something is larger or smaller

1   than the other?

2         MR. ISBESTER:  I am not a mechanical engineer, and

3   I don't have Mr. Wiand's 47 years of experience.  All I'm

4   left with is the claim language, Your Honor.

5         Can you bring up Claim 9, Mr. Hartman?  No, just --

6   just Slide 9.  I'm sorry, Slide 9, not Claim 9.

7         Do you see in the -- in the paragraph that has the

8   phrase "interference fit," I'm going to start reading from

9   the fifth line from the bottom:  The vertex of the bevel

10  being in contact with the receiving channel bottom -- I

11  don't think anybody's disputing what that means -- and

12  having an interference fit.  So now we're talking about the

13  vertex of the bevel having an interference fit with the

14  receiving channel bottom when held in the eyeglass frame.

15        So -- so the -- and remember that the frame doesn't

16  necessarily go all the way around the lens.  What the claim

17  says is that the interference fit is between the bevel

18  itself and the channel, not between the frame as a whole and

19  the lens that's placed into the opening in that frame.

20        THE COURT:  Well, that seems like a pretty

21  important point to me.

22        MR. ISBESTER:  As long as I've answered your --

23  your question, Your Honor.

24        THE COURT:  No.  I see -- I see what you're saying.

25        MR. ISBESTER:  Now, the other problem, or the next

problem with the Plaintiff's definition is that it doesn't

find any support in the specification.

If you look at the -- the places where interference

fit is used in the specification, it's nowhere defined.  It

simply refers to a fit of a bevel in a channel -- channel,

singular.

There's nowhere any discussion of the interference

fit being caused by the -- the lens being captured between

opposing sides of the frame.  The interference fit referred

to is always the interference fit within the channel, which

is referred to in the patent, by the way, Your Honor, as the

retention structure.

And that's what you see in the figures, too.  We've

already talked about Figure 2.

Now, Figure 2, you could imagine the -- the

addition of a frame at the bottom.

If we go to that, Mr. Hartman.

But I had to -- I had to create that drawing from

scratch.  That's not in the patent.  It'd be easy to -- for

a draftsman to add in that lower part and say that the

interference fit now is between the top and the bottom

portions of the frame.  But that isn't shown in the patent.

Instead, what you see in the patent -- go to the next

slide -- Figure 3B, you've got one channel with the bevel

fitting up into it.

```
 1              Figure 4, the exact same thing.

 2              Figure 5, the exact same thing.

 3              Nowhere in the patent does it describe a fit that's

 4  created by the opposing sides of the lens being captured in

 5  a frame.

 6              Finally -- I'm sorry, I'm getting -- I'm getting

 7  ahead of myself.  I'm only up to three of four.

 8              Next, the Plaintiff's definition contradicts the

 9  file history.  And here, we'd like to point to the

10  examiner's comments.  And the examiner essentially said:

11  I've got this reference Chappell, and it teaches how to hold

12  a lens in an eyeglass frame, and it matches up.  And he goes

13  through all the different ways in which it matches up with

14  the language of the claim, including interference fit.

15              And then he realizes, wait a second, it's not clear

16  what I mean by interference fit.  And so he adds in the

17  parenthetical:  The bevel fits into the triangular channel

18  in such a manner that the channel interferes with the motion

19  of the lens by frictional forces.

20              So that's what the examiner believed interference

21  fit to mean in 2012.  This patent was prosecuted for another

22  two and a half years after that without anybody saying

23  anything to the contrary.

24              Now, there is a slide that Mr. Halan used.

25              May I switch to the video camera -- document
```

1   camera?

2          I think it was their Slide 11.  And the point I'd

3   like to make about this quote is that it doesn't address

4   what is an interference fit.  It addresses whether or not

5   Chappell has an interference fit.

6          The quote that you've been provided, by the way,

7   Your Honor, also conflates two different arguments.  The

8   first paragraph -- or the start of the paragraph is an

9   argument to distinguish Claim 1 from Chappell.  But then you

10  see where the term "Chappell" appears right here, that's

11  actually a separate paragraph addressing Claim 25.

12         When you read this passage in the -- in its

13  entirety in context, I think you would agree with me that it

14  nowhere is contradicting the examiner's understanding of

15  interference fit.  It's simply disputing whether or not

16  Chappell has one.

17         Now, finally, Your Honor, I'd like to address a

18  point that you made in the -- thank you -- in your -- your

19  questions to Mr. Halan, and that is that the phrase -- the

20  definition of interference fit that's being offered by the

21  Plaintiff renders the phrase "in compression" superfluous.

22         Now, "in compression" is a term that was

23  specifically added in order to distinguish these claims over

24  the prior art and resulted in the allowance of the claims.

25  Without "in compression," these claims wouldn't have been

1   granted.  So it's got to mean something important, and it's

2   got to mean something different from the interference fit.

3          But when you look at the Plaintiff's definition of

4   interference fit, it's impossible to see that.

5          If you look at Slide 31.

6          So here's my doctored-up Figure 2 again.  And we

7   have an external dimension of the lens, per the Plaintiff's

8   proffered definition of interference fit.  And that external

9   dimension exceeds the internal dimension between the frame

10  channel bottoms.

11         Now, this is nowhere described in the patent, and

12  it's nowhere depicted in the patent.  So in an effort to try

13  and make this even more clear, I've doctored up another

14  figure from the patent.  I've taken Figure 9D, which is a

15  complete lens, and then I've created a cross-section of a

16  metal frame that that lens is supposed to fit into.

17         And the lens has an external dimension that exceeds

18  the internal dimension -- that exceeds the internal

19  dimension of the metal frame.

20         Now, the only way you're going to get that lens

21  into that frame and keep it there is by compressing it.  It

22  seems fairly unavoidable.

23         And if that results from the interpretation of

24  interference fit, then why did the examiner think that "in

25  compression" made a difference?  Why did the Plaintiff think

1    that "in compression" made a difference to the scope of the

2    claim?

3            Now, I'd like to make one more point that we

4    haven't raised previously in our briefs and we haven't

5    identified in any of the slides.

6            But if we can go back actually to the previous

7    slide, Mr. Hartman.

8            You see that the -- the definition of interference

9    fit proffered by the Plaintiff includes the language

10   "internal dimension between the frame channel bottoms."

11   My -- my colleagues just told me -- and Mr. -- Mr. Halan had

12   referred to this, and we just did a search to see whether

13   the phrase "frame channel bottoms," "channel bottoms,"

14   plural "channels" appears anywhere in the patent.  And it

15   doesn't.

16           Now, if the purpose of this invention was to create

17   an interference fit such that between two points on the

18   lens, two different channel bottoms, you had to squeeze the

19   lens into place, then surely that would have been described

20   somewhere in the patent.  But nowhere in the patent is there

21   any such -- any such discussion.

22           I'd like to conclude on interference fit by just

23   noting, Your Honor, that the definition that Plaintiff --

24   excuse me, that -- that Hoya has offered now, and -- and my

25   apologies both to counsel and the Court that -- that we

1   offered this only in our opposition brief, but as Mr. Halan

2   notes, we realized the force of their argument.  We had made

3   a mistake, and we sought to correct it.  And what we have

4   done is simply adopt the examiner's understanding of

5   "interference fit" from the file history.

6           One of the purposes of his -- the advantages of the

7   intrinsic evidence is that it provides notice to the public

8   of what is meant by the terms being used in the claims in

9   particular.  And certainly a member of the public reviewing

10  this file history would understand interference fit means

11  exactly what the examiner delineated there.

12          THE COURT:  How do you respond to Plaintiff's

13  argument that what you're effectively asking the Court to do

14  is to recognize the patentee as his own lexicographer, and

15  yet it's the examiner that adopts this, not the -- not the

16  applicant or the patentee, and to enter into your own

17  lexicography, it's got to be your adoption, not just your

18  acquiescence in what the examiner may say?  How do you

19  respond to that?

20          MR. ISBESTER:  Well, I don't regard this as a

21  lexicography issue.  And certainly we are -- we are not

22  suggesting that the examiner has expressly promulgated a

23  definition that is otherwise at odds with the record because

24  that's typically what happens in lexicography cases.  The --

25  the claim term means something in light of the specification

1    and -- and so forth, but the applicant says, that's not

2    exactly the meaning I want in this -- in this claim, in --

3    in this -- for this -- the purpose of this patent.

4            That's not what happened here.  Rather, the

5    examiner is looking at the record before him and saying:

6    I've -- I've come across this term.

7            What does the Plaintiff -- at that point,

8    Mr. Wiand, so the applicant, what does he understand

9    "interference fit" to mean?  And the examiner is inferring

10   from the record what "interference fit" is intended to mean

11   in the context of this patent and these claims.

12           That's not really a lexicography situation.  My --

13   my friend has suggested that what we're asserting is a

14   disavowal, an express disavowal.  No, that's -- that's not

15   the situation here at all.  We are not asking this Court to

16   find that the Plaintiff expressly disavowed, by virtue of

17   acquiescing in the examiner's interpretation.

18           Disavowal is a procedure or process by which the

19   applicant says things on the record that cause the scope of

20   the claim to be narrower.  And what we are saying is, no,

21   the scope of the claim is out here, and it's Plaintiff's

22   extrinsic evidence that is narrowing the claim, making it

23   smaller.

24           So this is not a disavowal argument either.  This

25   is simply reading a patent claim in light of the

```
 1    specification and the file history of which it is a part and
 2    inferring from that record what it is that the examiner, the
 3    applicant, and a member of the public would understand
 4    the -- the critical terms to mean.
 5         THE COURT:  All right.  It seems like you're asking
 6    to pack a lot into this inference that you believe the
 7    public would see and others that would view the entirety of
 8    the record would see and -- and be cognizant of.  Inferences
 9    are tricky things sometimes.
10         MR. ISBESTER:  Yes, Your Honor.  But our inference
11    has -- has two advantages.
12         First of all, it's clearly the inference the
13    examiner drew.
14         And, second -- if you go to the next slide -- it
15    entirely comports with the invention.
16         You know, our inference is consistent with this
17    being the invention.  Their extrinsic evidence definition is
18    not.
19         THE COURT:  Well, it seems like to me one of the
20    key issues here the Court's going to have to deal with, and
21    to a certain extent it seems to me that both sides are at
22    some level talking past each other, is the context of this
23    word "interference fit" and does it apply to a context that
24    involves a lens fitting within a frame, as Plaintiff
25    suggests, or does it lend itself to construction in a
```

1   context of merely the bevel relating to the channel.  And

2   those -- those are different things.  And you're both taking

3   different positions.  And I've heard a lot why each of you

4   think you're right.  I'm not so sure I've heard a lot why

5   you think the other one is wrong.

6          But the claim as a whole is going to have to be

7   read to -- by the Court in a way that identifies the proper

8   context for this disputed term, "interference fit," and it's

9   in all likelihood going to be one context or the other,

10  either the lens relating to the frame or the bevel relating

11  to the channel.  But I don't see how it can be both.

12         MR. ISBESTER:  I think you put your finger on

13  exactly the issue before the Court, and --

14         THE COURT:  And I'm not sure that the Court won't

15  benefit more from a fuller reading of the entire claim

16  language than from the specific argument on what's in one

17  party's construction as opposed to the other.

18         MR. ISBESTER:  I -- I could never disagree with

19  that comment, Your Honor.

20         What I would suggest, though, is that the

21  Plaintiff's construction is clearly dependent upon

22  "interference fit" describing a fit of the lens as a whole

23  within the eyeglass frame as a whole, and thereby

24  securing --

25         THE COURT:  Well, let me ask you this.  You make a

1    lot out of the fact that Plaintiff is presuming that the

2    frame completely -- and this is not precise -- but encircles

3    the lens.  It's not a circle obviously, but I'll use that

4    word.

5            The glasses I'm wearing, that I've worn for 10

6    years, have a frame at the top, but they have what I would

7    in very imprecise terms call a piece of fishing line holding

8    the bottom half of the frame.

9            MR. ISBESTER:  Your Honor, that's what Hoya calls

10   it, too.

11           THE COURT:  And I haven't taken these apart, and

12   I'm not about to, but I suspect that there's a bevelled edge

13   in the top half of the lens as it interfaces with the frame,

14   and yet in the bottom half of the lens, there's a groove for

15   that fishing line to fit in.  I'm not sure that -- I'm not

16   sure that my glasses, which don't have a frame that

17   completely encircles the lens, would cause me to construe

18   this term any differently than if I had a pair of glasses

19   where the frame did completely encircle the lens.

20           You seem to make a lot out of the fact that the

21   lens and the frame don't always cover 360 degrees around the

22   outer edge of the -- of the lens.  And you seem to imply

23   that that's -- that's a scenario that the Plaintiff is

24   hanging their hat on, for lack of a better phrase.

25           How -- how important -- I mean, tell me why -- tell

1   me why this construction is impacted by the fact that not

2   all frames completely encircle all lenses.  Why -- why does

3   that make as big of difference as -- as you believe it does

4   in this context as to the construction of this term?

5          MR. ISBESTER:  I think I may be slightly -- I hope

6   this doesn't sound like a semantical difference, but my --

7   what I'd like to convey is that the Hoya definition would

8   apply equally to the bevel and channel in your eyeglasses,

9   Your Honor, as it would to a set of eyeglasses in which the

10  frame entirely encircles the lens.  Nothing in the claim

11  language suggests that the claim is only applicable to

12  glasses in which the frame entirely encircles the lens.

13         And what I am -- what Hoya's trying to do is find

14  the claim construction that is most consistent with the

15  intrinsic evidence.  Remember, the specification

16  specifically talks about frames that have only half the

17  frame, such as yours, but the construction that's now being

18  offered by the Plaintiff would exclude a set of glasses such

19  as yours.

20         This -- as I say, it's a topsy-turvy world that --

21  Your Honor, in which we're arguing that Claim 1 of the '360

22  patent covers more product than -- than the Plaintiff would

23  suggest.

24         But in the intellectual integrity exercise, I don't

25  see how you can read into Claim 1 a requirement that the

1   frame encompass the lens.

2         And to -- to finish that argument off, Your Honor,

3   at the top where this frame -- where you have a rim around

4   your lens, very likely you're right, there is a channel and

5   a bevel.  And as long as -- as long as that bevel doesn't

6   pop out of the channel, you've got a fit.

7         Whereas, with the Plaintiff's definition, you've

8   only got a fit if the bevel is being forced up into the

9   channel by pressure from the fact that the lens is bigger

10  than the space into which it's being fit.

11        THE COURT:  All right.  How does that comport with

12  Figures 9D, E, and F in the '360 patent where you've clearly

13  got a bevel at the top of the lens and at the bottom of the

14  lens?

15        MR. ISBESTER:  Absolutely, Your Honor.

16        And that's why -- you may recall that I used Figure

17  9D in Slide 32 of -- of our slide deck.  I used Figure 9D as

18  the basis of the illustration.

19        But these are lenses that -- some of them would be

20  entirely encircled.

21        Now, I'm not sure that this applies to all of them.

22  There are -- sorry, I -- I didn't answer that very well.

23        These figures depict cross-sections from one side

24  to the other of the lens.  But I think if you go up to 9A,

25  you've clearly got a bevel at the top and a bevel at the

1    bottom.

2         But at 9B, and I -- I assume the labels refer to

3    the figure above, Your Honor, so 9B, you've got a bevel at

4    the bottom -- whoops, yeah, there you go, yeah -- and you've

5    got a groove at the top.  So it's not clear to me how that

6    lens is affixed on the side opposite the -- the bevel.  That

7    groove may be something that the fishing line fits into, for

8    example.

9         And then on 9C, again, you've got a complete lens,

10    and you've clearly got a bevel at the bottom, but is the top

11    going to be used as a bevel?  Is it going to fit into a

12    channel, or does that face get glued to a frame?  I mean,

13    you know, there are many different ways that these lenses

14    might be mounted.

15         THE COURT:  All right.  Well, let's try to circle

16    back to the beginning, counsel.  What else do you have with

17    regard to "interference fit" that you haven't told me so

18    far?

19         MR. ISBESTER:  I can't imagine talking about

20    "interference fit" any further, Your Honor.

21         THE COURT:  Okay.  Well, let me -- let me thank you

22    for that argument, and let me inquire if Plaintiff has any

23    brief rebuttal.

24         If not, we'll move on.  If you do, I'll hear it.

25         MR. HALAN:  Yes, I do, Your Honor.

1            THE COURT:  All right.

2            MR. HALAN:  Using the rule of primacy, the -- the

3    last thing that was pointed out was these Figures 8A, B,

4    C -- well, I'm sorry, Figures 9A, 9B, 9C, 9D, 9E, 9F.

5    Opposing counsel was trying to argue that some of these

6    figures -- that's not a bevel shot on top, but, instead,

7    it's a channel.  If you read the specification, all of those

8    things on top, whether it be 150, 154, 158, 162, 166,

9    they're all described as being a bevel, Your Honor.  Those

10   are bevels meant to fit into the channel.  So that was a

11   misleading comment.  I just wanted to point that out.

12           And, basically, this whole thing boils down to --

13   this -- this is a very commonly understood term in the art.

14   And so here while it's not further defined in the spec, but

15   this is commonly understood by all of those in the art.

16   Again, all the evidence we've pointed to shows that's the

17   way -- and the treatises in the optical industry, prior art

18   patents, it's -- it's used that way.  It's understood by

19   those in the art.  There was no reason for the -- the

20   inventor to put in any additional definition.  It's just the

21   way it's commonly understood.

22           And I wanted to point out that -- but, yeah, Hoya

23   points to nothing -- nothing to contradict those other than

24   they're relying on this examiner's statement, and who knows

25   what the examiner is really trying to say, but that was

1   never adopted by the patentee.

2          He pointed -- we talked about this -- this partial

3   frame.  I just want to point out that -- hold on -- that is

4   part of a description from Column 4, Line 59, through Column

5   5, Line 14, of various embodiments.

6          And, first off, I want to point out that it's our

7   position that a frame would not have to completely encircle

8   a lens for there to be an interference fit.  For example, if

9   we can imagine a -- a purely circular lens for -- it's

10  easier to understand.  Let's say the frame only encircled

11  70 percent of it.  If it was an interference fit, the lens

12  still wouldn't be able to fall off because it would -- it

13  would be encircled by slightly more than 50 percent.  So

14  we're not saying the frame always has to be encircled, but

15  there does have to be an interference fit.

16         They're, again, arguing that this is simply

17  interference fit.  But, again, this contact between the

18  vertex of a lens with the channel is claimed in other parts

19  of the claim.  It's not part of the interference fit claim.

20  The interference fit is something in addition to this.

21  This -- their limitation alone is not interference fit.  It

22  can't be.

23         They also made this argument about the -- the

24  length of our claim construction.  Again, our real claim

25  construction is that part that we have highlighted in green,

1    Your Honor.  And we -- we told you that this morning, we're

2    not seeking this lengthy claim construction.

3         And their -- their argument is that we are seeking

4    a lengthy claim construction in order to broaden our claim.

5    That was one of their arguments they made, a -- a lengthy

6    construction would actually try to narrow it.  But we're

7    only relying on the one definition of interference fit

8    that's in green, and that's in our Slide 3.

9         THE COURT:  I'm not so concerned about how many

10   words are there --

11        MR. HALAN:  Okay.

12        THE COURT:  -- as I am what the words are.

13        MR. HALAN:  Thank you, Your Honor.

14        Go to Slide 18 if you can.

15        Yeah, they also made -- Claim 1 -- they pointed out

16   that Claim 1 recites the receiving channel defined by

17   opposed interior wall surfaces, and they're saying that

18   means it has to be triangular, as they're trying to fit into

19   this claim limitation -- or they're trying to fit a -- a

20   triangular limitation into their definition.

21        But, again, as shown here and explained, you can

22   have opposed wall surfaces with a flat surface between which

23   is shown in Figure 6 on the right.  And this is specifically

24   one of the embodiments or the various embodiments defined in

25   the invention.  So it doesn't have to be triangular.  Again,

1  they're trying to add limitations that aren't part of a --

2  the definition of interference fit.

3          And -- and I guess I still don't really

4  understand their tolerance argument because our -- our --

5  we're not concerned with tolerances.  We're -- we're

6  concerned about the interference fit that has -- which means

7  that the -- again, the dimension has to be larger than the

8  frame dimension.

9          And, again, they -- they said that our -- our

10  extrinsic evidence, we were cherry-picking, but if we were

11  cherry -- again, they've offered nothing, again, in

12  opposition to the -- all the extrinsic evidence, the --

13  which is a lot.  I mean, it's all in the optics industry.

14  Again, they're relying on just some of the examiner's -- the

15  statement.

16          And in Phillips it -- Phillips itself said that if

17  there's a claim term at issue, and it's not a commonly

18  understood claim term by lay people, but it's understood in

19  the art by experts -- not by experts but by people of --

20  of -- in the industry, you can rely on extrinsic evidence to

21  understand what that claim term means.

22          THE COURT:  What else, counsel?

23          MR. HALAN:  I'm trying to look through my notes

24  here, Your Honor.  I'm not sure if there's anything else or

25  not.  May I have one second, Your Honor?

1          THE COURT:  Take a moment.

2          MR. HALAN:  I have one comment on one of the

3    slides.  Oh, that's right.

4          So his Slide 22, also, he's -- he's -- he cites

5    quotes from different portions of the specification and says

6    that the specification nowhere defines interference fit as

7    we're asserting it.  And, again, there is no -- we're not

8    saying there was a clear definition.

9          But if you -- he picked and chose language from

10   these portions of the spec.  If you -- if you get beyond the

11   ellipses, what these are describing is -- in all these

12   instances is a fit in which the lens is secured within the

13   frame by an interference fit, which, again, an interference

14   fit in the nomenclature of the industry means that the --

15   one dimension exceeds the other dimension.

16         And that's all I have, Your Honor.

17         THE COURT:  All right.

18         MR. HALAN:  Okay.

19         THE COURT:  Thank you, Mr. Halan.

20         Let's move on to "in compression," our next

21   disputed term.  And --

22         MR. HALAN:  Thank you.

23         THE COURT:  -- we'll follow the same order.  Let me

24   hear from the Plaintiff first.

25         MR. HALAN:  Okay.  So, again, Your Honor, this

1  slide shows -- on the left side is our -- the construction

2  we've been asserting.  And, actually, we don't think this

3  term actually needs construction.  We think the word

4  "compression" is easily understood.  We only offered a

5  construction because they were asserting a construction was

6  needed.

7       So -- and they started off by -- again, the

8  original definition was pressed against something.  Again,

9  after we pointed out in our brief this was -- couldn't be

10  true.  Again, they understood the -- the error of their ways

11  and, again, tried to come up with an alternative deposition

12  (sic).  And their definition now is being pressed together

13  but not necessarily into less space.

14       THE COURT:  Well, that's the problem.  Both of you

15  are saying the term needs no construction, its plain and

16  ordinary meaning should apply, but then you go on to recite

17  what you each believe the plain and ordinary meaning is, and

18  they don't match up.

19       MR. HALAN:  That's right, Your Honor.

20       THE COURT:  Particularly whether it can or can't --

21  or that -- should be and must necessarily be pressed into

22  less space or not necessarily placed into less space.

23       MR. HALAN:  Right, Your Honor.  Well, their

24  definition would actually include it being compressed into

25  less space.  They -- they say it's not necessarily less

1    space.

2              THE COURT:  Right.

3              MR. HALAN:  But if you go to the next slide.

4              Again, this goes to what we talked about earlier,

5    Your Honor.  Their argument -- basically, their only

6    argument against our construction is that if you press

7    something into less space, it must deform.  And our patent

8    doesn't always require deformation, and we agree with that.

9              But as we pointed out earlier today, there's a

10   variety of reasons why compression does not necessarily

11   cause deformation.  Again, the frame itself could bend or

12   deform.  And it depends on the stiffness of materials and

13   the extent of the compression.

14             And, also, in the prosecution history itself, it

15   was stated that the lens could be compressed at the vertex

16   and make it form at the vertex, meaning that it doesn't

17   always have to form at the vertex.  So by the prosecution

18   history itself, the patentee was saying that compression

19   doesn't always cause deformation.

20             Our position is that if you read, again, the

21   context -- you have to take the context within the claim,

22   and that's why we cite this case down here which is quoted

23   from Phillips, saying:  Notably, the context in which a term

24   is used in the asserted claim can be highly instructive for

25   claim construction.

```
 1              In this case, the context in which it's used is in
 2   junction with interference fit.  So if you go back to the
 3   previous -- previous page, that's why we say it should
 4   mean -- mean pressed into less space because that comports
 5   with interference fit, and any other definition would not.
 6              And, again, it would be fine, Your Honor, if we
 7   just did not define it at all because we don't think it
 8   needs to be defined.  I think any jury can understand the
 9   word "compression."  It's not a -- and that's all I have,
10   Your Honor.
11         THE COURT:  All right.  Let me hear a response from
12   the Defendant.
13         MR. ISBESTER:  Your Honor, may I first add one
14   sentence regarding interference fit, or is the book on that
15   closed?
16         THE COURT:  One sentence.
17         MR. ISBESTER:  If I may have the camera on.
18         The patent describes Figure 3B as a cross-sectional
19   view of the bevel in the interference fit with an eyeglass
20   frame.  And that's -- this is 3B.  This is an interference
21   fit, according to the patent.
22         THE COURT:  All right.  Let's move on.
23         MR. ISBESTER:  Let me turn to compression then.
24         THE COURT:  How do you compress something but not
25   necessarily in less space?
```

1          MR. ISBESTER:  Well, Your Honor, this -- this big

2    building is clad in brick and stone, and I'm sure the bricks

3    at the bottom of the wall feel that they're under

4    compression.  But let's hope that they're not taking up less

5    space.  Lots of things are placed in compression, and their

6    value, their virtue is that they don't take up less space

7    when placed in compression.

8          Furthermore, the claim language itself requires

9    that the -- the bevel in some instances be compressed and

10   deformed.  Well, any time you put something into less space,

11   it seems to me, you are inherently deforming it.  It no

12   longer has the form it used to have.  It now has a new form

13   that fits into less space.

14          THE COURT:  What if you have a rubber ball and you

15   have it in a compression chamber and you raise the

16   compression such that all the surface of the rubber ball has

17   the same amount of force applied to it at the same time,

18   would not that ball just shrink in size but would remain in

19   the same exact shape?

20          MR. ISBESTER:  It might have the same exact shape,

21   but the two-inch diameter ball is now only an inch and three

22   quarters in diameter.  It has a different form, and the

23   question is not --

24          THE COURT:  It's still a ball.  It's a smaller

25   ball, but it's still a ball.  There's no deformation there.

1            MR. ISBESTER:  Your Honor, it hadn't occurred to me

2      that the word "form" is the word we should be -- we should

3      be construing here, or -- or deform.

4            My understanding of the word "form" is that it

5      includes changing something's shape.  Something that is

6      merely shrunk or enlarged but has the same shape would still

7      be deformed.  It would no longer have the same form, and,

8      therefore, compression is entirely -- if -- if you define

9      compression as being under pressure or pressed together and

10     having -- and taking less space, then you are defining "in

11     compression" to be the same as or at least a -- a flavor of

12     deformation.  And since the claims distinguish between the

13     two, that would be impermissible.

14            I could go on, Your Honor, to the point that the

15     specification clearly distinguishes between deformation and

16     compression.  And the file history is quite lengthy about

17     how it is important to avoid deformation even when there is

18     compression.  But if one doesn't start from the same

19     starting point that shrinkage into a smaller space, a

20     smaller volume is a form of deformation, I'm not sure any of

21     that argument matters.

22            And -- and, frankly, I'm not sure that Mr. Halan

23     would -- would dispute my argument that both the

24     specification and the file history distinguish between being

25     in compression and deformation.

1          But it comes down to then what -- what we should

2   have done perhaps is provide your -- provide Your Honor with

3   guidance as to what we thought deformation meant.

4          THE COURT:  Well, certainly there can be

5   compression that has with it deformation, but I'm not so

6   sure that there can't be compression that doesn't always

7   have deformation with it.

8          And you're saying -- you're saying by the two-inch

9   rubber ball being compressed with the exact same force on

10  all its surface such that it's now an inch and three

11  quarters, that that's deformed --

12         MR. ISBESTER:  Yes.

13         THE COURT:  -- in and of itself.

14         MR. ISBESTER:  Yes, Your Honor.

15         THE COURT:  And I'm not sure I agree with that.

16         MR. ISBESTER:  Okay.

17         THE COURT:  It's compressed, no doubt about it.

18  But I'm not sure it's compressed and deformed.

19         Now, if the -- if the pressure wasn't the same on

20  all parts of the surface, it certainly would be deformed,

21  but --

22         MR. ISBESTER:  Well, let me go back, Your Honor, to

23  the -- and leave -- leave aside the question of -- of

24  deformation for the time being.

25         Let me go back to my building materials.  Surely,

one of the advantages, one of the -- the virtues of concrete

and granite rock and brick is that even under compression,

sufficient to hold up bridges and buildings, they don't

shrink to take less volume.  They -- they retain the -- the

volume that they were carved or poured to retain at the

outset.

And yet we would still call those "in compression."

We don't object to the pressed together aspect of

Plaintiff's definition.  We only object to the notion that

there be some contraction in the volume necessarily in order

to effectuate compression.

And -- and the reason, Your Honor, of course, is

that Plaintiff is trying to find a basis to distinguish the

prior art from this claim.  And the prior art will teach --

the prior art will teach a -- a lens that is pressed on the

top and the bottom by the frame, but the prior art perhaps

doesn't say and thereby the lens shrink to a smaller volume

or is compressed into a smaller volume.  And this will be a

point of distinction that the Plaintiff argues between its

claim and the prior art.

So it -- it's not entirely an academic exercise.

I'd also like to point out that we aren't talking about a --

we're not talking about a rubber ball that's being

compressed on all sides.

If we can go to Slide 32.

1          THE COURT:  No, we're certainly not, but we're also

2    talking about a lot of illustrations that don't have

3    anything to do with the patents-in-suit.  I mean, obviously,

4    from a historical context, we're talking about eyeglasses

5    that used to have glass lenses that now have plastic --

6          MR. ISBESTER:  Yes.

7          THE COURT:  -- or polycarbonate lenses and pressure

8    on the glass causes it to break or shatter.  Pressure on the

9    plastic causes it to compress.

10          Now, does that also mean it deforms?  We get back

11    to the same issue.

12          MR. ISBESTER:  Well, and -- and as best I can, I'm

13    going to try and respond to Your Honor's question without

14    using the word "deformation" or "deform."

15          When this lens shown on the screen now is forced

16    into the smaller gap between the top and the bottom of the

17    frame, is it simply going to retain its same shape and --

18    and get smaller?  I don't think so.

19          What's going to happen is it's going to bow, to the

20    extent it gives, and the frame is going to stretch, to the

21    extent it gives.

22          But you would still call that lens "in

23    compression."  There's certainly nothing in the patent that

24    suggests that when the lens is in the frame, by virtue of

25    the pressure exerted on the lens, it assumes a smaller

1    shape.

2           There's actually a discussion in the patent about

3    how the preliminarization process in a patent -- in a

4    plastic lens continues even after the lens has been

5    fabricated, and as a result, the lens shrinks.  But that's

6    not related to the compression.  That's related to the

7    chemical nature of the lens in question.

8           So we don't see any -- any basis in the

9    specification or the file history for this less space

10   component of compression.  And if it is a plain and ordinary

11   meaning word, would you not say that those blocks at the

12   base of the pyramid are in compression, but they've been the

13   same size for 3,000 years.

14          The plain and ordinary meaning doesn't include

15   being shrunk in some uniform fashion so that the shape

16   doesn't change but the volume does.

17          THE COURT:  Well, I'm not at all sure the blocks at

18   the base of the pyramids are identically the same shape as

19   they were 3,000 years ago.  They may --

20          MR. ISBESTER:  Fair point, Your Honor.

21          THE COURT:  -- they may have -- whether we want to

22   call it compressed or deformed or whatever word we want to

23   use here as a verb, they may be nearly identical to the same

24   shape before or same size before, but I'm not sure there's

25   not some terribly small difference in size or shape.

1          The amount of compression/deformation is going to

2    obviously wide -- widely vary given the materials that are

3    at issue.  The rubber ball may be at one extreme and a

4    diamond at the other.

5          MR. ISBESTER:  Uh-huh.

6          THE COURT:  But I'm not at all sure that -- I'm --

7    I'm trying to envision compression that over time does not

8    result in a change in the shape or the space of the item

9    that's compressed.

10         Can you -- can you tell me something that over

11   time, with constant pressure, maintains its exact same

12   dimension, shape, size?  Can you give me an example of

13   something in the real world?  I'm not sure I buy the fact

14   that the blocks at the pyramids -- they may be 99.15 times

15   past the decimal 9s the same shape they were 3,000 years

16   ago, but you can't put that much weight on them over that

17   length of time.  I'm not sure there's any substance on this

18   planet that given enough pressure and enough time doesn't

19   change and become smaller in perpetuity.  It may be a

20   terribly small difference in shape or size, but --

21         MR. ISBESTER:  I think what you would see, Your

22   Honor, is that most things that are unable to support the

23   weight on them and remain -- so let me take a step back.

24         There's -- Your Honor raises the -- the potential

25   of something that has changed in volume by one billionth of

1    its size.  And I simply am not equipped to deal with the

2    non-discernible changes.  And with all due respect, Your

3    Honor, you have no record upon which you can address that

4    either.

5             For the purposes of this technology --

6             THE COURT:  You're trying to persuade me that

7    you're right, and I'm trying to push back verbally --

8             MR. ISBESTER:  Yes, okay.

9             THE COURT:  -- to see if you can counter the

10   push-back and convince me further.  We call that oral

11   advocacy.

12            MR. ISBESTER:  Well, I appreciate the opportunity

13   to --

14            THE COURT:  Sure.

15            MR. ISBESTER:  -- to pursue it.

16            Most discernible reactions to pressure in the kinds

17   of materials we're talking about here, polycarbonate, very

18   carefully constructed polymer plastics, the metal of the

19   wire frame are going to be some kind of change in shape to

20   relieve the pressure.  And that's why I -- I pulled up this

21   slide and talk about the bowing that's going to occur in the

22   lens and the stretching that's going to occur in the frame.

23            Those are the first, second, third, and fourth

24   order changes in shape.

25            THE COURT:  Well, let me --

1          MR. ISBESTER:  If there's shrinkage, if there's

2     reduction in volume, I think that's going to be so minute

3     that in the plain and ordinary meaning of the phrase

4     "compression," it would disappear.

5          THE COURT:  Well, let me ask in this context, then.

6     Are you basically asking me to assume that when the larger

7     lens is forced into the smaller frame and fits within those

8     channels, that the stretching is all transferred to the

9     frame and the lens doesn't -- though it's in compression, it

10    doesn't change its shape and therefore it doesn't deform in

11    any way?

12         MR. ISBESTER:  Absolutely not, Your Honor.

13         THE COURT:  Okay.

14         MR. ISBESTER:  And, in fact, what we think

15    happens -- if the lens is too big for the -- for the socket,

16    then you run into a real problem, because the lens tends to

17    bow.  It tends to change shape.  The curvatures are now

18    different from what the optician ordered.  And you have a --

19    a situation in which the patient is unhappy because the lens

20    is no longer optically what is made to correct the vision.

21         THE COURT:  Well, if the size of the lens is

22    significantly different than the size of the frame, perhaps

23    that bowing takes place.  But if the differential between

24    the size of the lens and the size of the frame is much

25    smaller, then what takes place is this bevel compacts or

1   it -- it fits in your triangle.  The -- the wood piece fills

2   out and deforms as it fits in more snugly.  And so the lens

3   doesn't bow, but it's the bevel that -- that deforms and

4   gives you a stronger fit.

5           MR. ISBESTER:  Exactly.  And at that point, Your

6   Honor, the bevel is actually changing shape.  We -- the --

7           THE COURT:  Right.  And so how do we do all this

8   and not necessarily change in shape, as you're asking me to

9   find?

10          MR. ISBESTER:  Oh, no.  No, I'm sorry, Your Honor,

11  we're not asking you to say the compression is without

12  changing shape.

13          THE COURT:  Well, unless --

14          MR. ISBESTER:  We're saying compression doesn't

15  necessarily require a change in volume in taking up less

16  space.  We think -- we think compression results in things

17  changing shape all the time, especially when you're talking

18  about plastic lenses.

19          THE COURT:  Okay.

20          MR. ISBESTER:  It's only that you can't get that

21  same amount of plastic into any less volume, even though you

22  can warp it and bend it and twist it all sorts of ways.

23          THE COURT:  That's a fair point.  What else?

24          MR. ISBESTER:  Your Honor, I don't think there's

25  any -- the file history or the specification would assist,

1 so I will dispense with arguments about that.

2   THE COURT:  All right.  Thank you.

3   Mr. Halan, do you have a brief rebuttal?

4   MR. HALAN:  One second, Your Honor.

5   Your Honor, we have nothing else.

6   THE COURT:  Okay.

7   MR. HALAN:  Thank you, Your Honor.

8   THE COURT:  All right, then.  That will complete

9 argument on "in compression."

10   Counsel, do I understand that the parties agreed to

11 submit "defined by" and is -- "is from" to the Court on the

12 briefing, or do you want to present oral argument on these

13 terms?

14   MR. HALAN:  We're going to let it ride on the

15 briefing, Your Honor, but if you have any questions, we're

16 ready and willing to answer them.

17   THE COURT:  Defendant take the same position?

18   MR. ISBESTER:  Yes, Your Honor.

19   THE COURT:  All right.  Well, that's not to say

20 that 10 minutes from now, I won't have questions, but as I

21 sit here right now, I don't.

22   So I'll consider those terms on the briefing that I

23 have complete in the file.  And I'll consider the first two

24 terms on the argument that you've given me, along with that

25 briefing.

1         And unless you have something else for me, that

2 will complete argument on claim construction for this

3 afternoon.

4         I am going to take these matters under submission.

5 I'll try to get you guidance by way of a written claim

6 construction order as soon as possible.

7         I am going to direct that you mediate your disputes

8 within 30 days of the issuance of my claim construction

9 opinion.

10         Any questions from either side before we recess for

11 the day?

12         MR. HALAN:  Your Honor, just one comment.  If you

13 do have a question on those last two terms, if you want us

14 to submit a one-page something, we're willing to do so.

15         THE COURT:  I understand.  I know how to do that,

16 counsel.

17         MR. HALAN:  Okay.

18         THE COURT:  I won't be bashful.

19         MR. HALAN:  All right.  Thank you, Your Honor.

20         THE COURT:  Anything from Defendant?

21         MR. ISBESTER:  Your Honor, I -- the only question

22 that occurs to me is that I believe a date has been set for

23 the mediation.

24         THE COURT:  And if it has, that's probably

25 something I need to know.  Hopefully it's not tomorrow.

```
 1              MR. ISBESTER:  I believe it's May 2nd, Your Honor.

 2              THE COURT:  May 2nd.  We're still in March.  You'll

 3   have an opinion long before May 2nd.

 4              MR. ISBESTER:  Thank you very much, Your Honor.

 5              THE COURT:  All right.

 6              MR. HALAN:  Thank you very much, Your Honor.

 7              THE COURT:  All right.  Counsel, thank you for your

 8   submissions.  The Court stands in recess.

 9              COURT SECURITY OFFICER:  All rise.

10              (Recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              CERTIFICATION

2

3            I HEREBY CERTIFY that the foregoing is a true and

4      correct transcript from the stenographic notes of the

5      proceedings in the above-entitled matter to the best of my

6      ability.

7

8

9       /S/ Shelly Holmes                      4/29/18
        SHELLY HOLMES, CSR-TCRR                 Date
10     OFFICIAL REPORTER
       State of Texas No.: 7804
11     Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25